Shaw, C. J.
The principle we believe is now well established, that incorporated banks, being associations of persons authorized by law to borrow and lend money, purchase, sell, and discount bills of exchange and promissory notes, to issue bills, receive deposits, and generally to deal in money and securities, as well for their own profit, as for the accommodation of the mercantile community, are entitled to the same benefits, and subject to the same duties and obligations, as an individual person, so far as they act within the legitimate scope of the objects and purposes for which they are established. One important and highly useful part of their regular functions is, to collect bills and notes for other persons, in the places where they are established, and to remit to othei; places, for the like purpose, when they are there payable. The benefits which the collecting bank derives from the use of the funds, whilst in its custody, and the profits on exchange, are a valuable compensation for the labor and expense to which the business subjects it, and constitute such a bank, in acting for others, an agent for reward. *21 It may seem inconsistent with strict propriety to say that an aggregate corporation may be guilty of a wrong, and be chargeable in an action for a tort; but in reality an action of the case proceeds on the ground, that a duty exists, that the defendant has failed in the proper performance of that duty, by means of which the plaintiff has sustained a loss. When such a duty devolves on a corporation, they are responsible for the skill and fidelity of their agents, and the form of an action of the case is well adapted to afford the proper remedy. Bank of Washington v. Triplett, 1 Pet. 25. Fabens v. Mercantile Bank, 23 Pick. 330. Bank of Utica v. Smedes, 3 Cow. 662.
Two questions arise in the present case: First, whether in consequence of the presentment and demand of the plaintiffs’ post note, on the 12th day of July, which was the day of payment without grace, and notice to the indorsers on the same day, the plaintiffs lost the benefit of their legal recourse to the indorsers: Secondly, if this is established, whether the circum stances disclose such negligence and unskilfulness on the part of the agents and officers of the defendants, as to make the defendants liable, in this action, for the damages.
I. The case has been argued on both sides, upon the admit ted facts, that the note in question was a note issued by the Franklin Bank, payable to A. B. or bearer, #1000, in three months, with interest, at 4J per cent, till due, and no interest after; dated 12 April, 1837, and marked in the margin, “Due July 12, 1837.” A note of this description, when issued by a bank, is usually denominated a post note, though a note in the same terms, issued by an individual person, would be called a promissory note. When was payment of this note legally de-mandable ? It is frankly conceded, on the part of the defendants, that the case of Perkins v. Franklin Bank, 21 Pick. 483, is directly in point, and that it cannot now be decided that this note was legally payable on the 12th of July, without reversing that decision. The cases are certainly, in this respect, precisely alike. In recurring to that case, we cannot perceive any ground, were it now a new question, upon which it could be decided differently. It is said that a similar question has been differ *22 ently decided in New York. It may have been so held, upon the general custom of merchants, or upon a statute expressed in different terms. But the case of Perkins v. Franklin Bank was determined upon a statutory provision, which scarcely admits of construction. The terms of the Rev. Sts. c. 33, § 5, are these : “ On all promissory negotiable notes, orders and drafts, payable at a future day certain, within this State, in which there is not an express stipulation to the contrary, grace shall be allowed, in like manner as it is allowed, by the custom of merchants, on foreign bills of exchange, payable at the expiration of a certain period after date or sight.”
No exception is made in regard to notes made by banks, and therefore they are bound. In general, corporations are bound by general laws respecting the effect, operation and construction of contracts, in the same manner as natural persons.
If it be argued that, after all, the statute does refer to the custom of merchants, and therefore lets in proof of that custom, to show the extent of the regulation ; the answer is, that it only refers to so much of the custom of merchants, as relates to foreign bills of exchange. That grace shall be allowed on promissory notes, is the subject of positive enactment, and not made to depend on any custom; and the reference is made to the custom respecting foreign bills of exchange, for the sole purpose of defining what is the regulation understood by the term “ grace.” That custom having determined that “ grace ” means three days added to the term stipulated in the note, the statute authoritatively declares that it shall apply to such notes. Then the only question is, whether such a note, issued by a bank, is a negotiable promissory note, payable at a day certain, within this State. It was argued on the former occasion, that the memorandum in the margin, designating the day certain, on which it will be due, brings b within the exception. It certainly does designate the day, on which by agreement the note will be payable. Then the statute comes in, and declares, that, beyond the day so fixed by agreement, three days shall be allowed, before payment can be legally demanded, unless other *23 wise expressly stipulated. . If such a stipulation could be inferred from the fact of designating the day of payment, the exception would annul the enactment, because the case stated in the statute always supposes such day fixed by the terms of the contract. Besides; there must be an empress stipulation, that is, a stipulation in terms, or by necessary implication from the terms; and therefore a probable intention, to be inferred from usage or other circumstances, cannot stand in place of such express stipulation.
But supposing the point to be settled by the case cited, that this note was not payable, and could not be legally demanded till the 15th of July, yet the defendants contend, that it is competent for the parties to a negotiable instrument to waive demand and notice, or to consent to a mode of demand and notice different from those prescribed by the general law; that such an agreement may be inferred from the usages of banks, and the tacit assent of the parties to such modes of demand and notice; and that, from the usage proved in the present case, such assent may be inferred; and therefore that the indorsers were bound by the demand made and notice given on the 12th of July.
Undoubtedly parties to negotiable notes may waive demand and notice, and, as a modification of that power, may agree to qualified modes of demand and notice; and a compliance, on the part of the holders, with such qualified modes, will be sufficient to bind the indorsers. But we are not aware of a case, in which, under such agreement, express or tacit, in regard to the mode of presentment, demand and notice, the time of payment can be accelerated, or, where any notice to indorsers is required, that such notice can be given, before the actual dishonor of the note. Any agreement, which would accelerate the time of legal payment, would be a change of the contract, and must be made in such form, and on such consideration, as would be sufficient to constitute a substantive contract.
Under the long established practice of the banks of Massachusetts to issue notices to promisors, on the stated day of payment, without grace, or a few days previous, informing them *24 that the note is in such bank, that it will be payable on a day named, being the last day of grace, and requesting the promisor to come to the bank and pay it; if the note is in fact in such bank, and remains unpaid till the close of usual bank hours on that day, it has been held to be dishonored, and notice may then be given to the indorser. In other words, such previous notice to the promisor, and neglect on his part to pay the note at the bank, are a conventional demand and refusal, amounting to a dishonor of the note. But, in such case, it is not the delivery of the previous notice to the promisor, which constitutes the presentment, nor would an actual presentment, demand and refusal, before the last day of grace, constitute such default of the promisor, as to be a dishonor of the note It is the failure to pay at the bank during bank hours, on the last day of grace, which amounts to such dishonor. New England Bank v. Lewis, 2 Pick. 125. Boston Bank v. Hodges, 9 Pick. 420. Such custom does not accelerate nor alter the day of payment.
In Mills v. U. S. Bank, 11 Wheat. 431, it was held that where it is the known usage of banks to demand payment and give notice on the fourth day of grace, it is sufficient; but this usage did not alter the terms of the contract, nor affect the day of payment. Bank of Washington v. Triplett, 1 Pet. 25, decides the same point, that demand, on the day after the last day of grace, may be warranted by usage. The case of Blanchard v. Hilliard, 11 Mass. 85, seems to have a contrary bearing. But it is difficult, from the short note of the opinion in that case to determine whether the court meant to decide, that by the usage of banks and the assent of the parties thereto, the note should be deemed to be due on the day on which the notice was given, or whether, although the note was not legally due until the next day, yet the parties might consent that notice should be given on the day preceding. We think the court put it upon the latter ground; and therefore treated it as a case where the indorser had waived legal notice. The case however seems opposed to that of Wentworth v. Clap, cited in the note, which somewhat diminishes its authority.
*25 Lincoln & Kennebeck Bank v. Hammatt, 9 Mass. 159. decides nothing more than that notice by mail, to an indorser, is sufficient, though not actually received; a point fully established since, by a series of cases. Shed v. Brett, 1 Pick. 401.
But if this were more doubtful, we think it very clear, that when notice has not in effect been waived, where notice is necessary to charge the indorser, although the mode of giving notice, and the time of giving notice of dishonor to the in-dorser, may be the subject of tacit or express agreement, yet it must necessarily be after the note is dishonored. The notice to be given is of a fact, a thing done; and such notice necessarily implies, that the note has become due, and has been dishonored. This cannot be given till the fact has occurred, therefore cannot be given till after the note has become due, by the expiration of the days of grace. Any notice, previously to such actual dishonor, could only inform the indorser of the holder’s intent to present it, perhaps of his expectation that it would not be paid, and his intent to hold him responsible, if the note should not be paid. Grand Bank v. Blanchard, 23 Pick. 305. Gilbert v. Dennis, 3 Met. 495. This point is confirmed by that numerous class of cases, in which it is held, that no particular form of notice to an indorser is necessary ; that it is sufficient, if it states the fact of the non-payment of the note, and that the holder looks to the indorser for indemnity.
But if there were any doubt of this point, we can perceive no evidence in the present case, that there has ever been any usage amongst banks or individuals in this Commonwealth, to give notice to indorsers of the non-payment of a post note, or any other note, until the time for payment of the note by the promisor had arrived. In the case of Boston Bank v. Hodges. already cited, such notice was held insufficient.
The court are therefore strongly inclined to the opinion, that in consequence of the failure of the defendants to give notice to the indorsers of the dishonor of the note, the indorsers were discharged from their legal liability on the note. And if this was the case, the holder was under no obligation to commence a suit against the indorsers before commencing an action against *26 the defendants. The presumption is, that if the indorsers were legally discharged, they would avail themselves of that dis charge, in defence ; and the plaintiffs were not bound to prosecute a fruitless suit against them. The gravamen of the plaintiffs’ complaint is, that the defendants, by their neglect and mismanagement, have deprived them of their legal right to charge the indorsers.
II. But it does not by any means follow, because the plaintiffs have lost their remedy over against the indorsers, for want of due presentment and demand being made by the defendants on the promisors, and due notice thereof given to the indorsers, that such proof alone is sufficient to enable the plaintiffs to sustain this action. This fact must undoubtedly be proved; but it is necessary further to prove, that this result was attributable directly to such neglect and want of due skill of the defendants, as in law is sufficient to render them responsible. Although, says Mr. Chief Justice Marshall, in the case of Bank of Washington v. Triplett, 1 Pet. 36, the liability of the bank, charged with negligence, will depend on the question, whether the liability of the drawer or indorser has been discharged by want of demand and notice; the bank was the agent of the holder, and not of the drawers, and might consequently so act as to discharge the drawer, without becoming liable to its principal.
The rule of law, we think, is stated with sufficient accuracy in a recent case, and it is this ; where a bank receives a note for collection, it is bound to use reasonable skill in making the collection, and for that purpose is bound to make a seasonable demand on the promisor, and in case of dishonor to give due notice to the indorsers, so that the security of the holder shall not be lost or essentially impaired, by the discharge of the indorsers. Fabens v. Mercantile Bank, 23 Pick. 330. As an agent, such bank is bound to the use of reasonable skill and ordinary diligence. By reasonable skill is understood such as is ordinarily possessed and exercised by persons of common capacity, engaged in the same business or employment; and by ordinary diligence is to be understood that degree of diligence, which persons of common prudence are accustomed to use about their *27 own affairs. Story on Agency, <§> 183. This is applicable to a great variety of employments, requiring a considerable degree of care and skill; as attorneys; Gilbert v. Williams, 8 Mass. 51; insurance brokers; Chapman v. Walton, 10 Bing. 57; factors; Leverick v. Meigs, 1 Cow. 645; surgeons; Seare v. Prentice, 8 East, 348; and so of all similar employments. The difficulty is not so much in stating the rule and estaolishing it by authorities, as in applying it to particular cases.
In general, the rules of law in regard to the presentment of bills of exchange and promissory notes for payment, and for giving notice to indorsers, in case of dishonor, are so plain and simple, so well known by notaries public, cashiers of banks, attorneys and brokers, that any failure to comply with them, by an agent, acting in behalf of another, would carry with it such proof of either want of skill or want of ordinary diligence, as to render him liable to his principal. It is therefore often laid down in general terms, that when the holder of a bill or note has lost his remedy, by these means, against a responsible party, and thereby sustained damage, he has his remedy against his agent. But the specific question to be considered is, whether in all cases an agent is bound to know the rules of law, and conform to them at his peril, in the transaction of his employer’s business, although the course of proceeding may depend upon statute provisions so recently passed as not to be generally known, or decisions of those courts whose judgments are usually regarded as precedents and rules of practice, either not promulgated at the time, or so recently given, as not to be generally known among business men. It is undoubtedly a salutary maxim, that every man is bound to know the law, and that ignorance of the law excuses no one; yet these max ims must be confined to the cases for which they were adopted. In the criminal law, a man is estopped from setting up his ignorance of the law, as an excuse for its violation, because it is his duty to inform himself. So in regard to his own rights, in lealings with others, he must, at his peril, ascertain his lega ights, and must be presumed to act in conformity to them; otherwise, there would be no safety for others in dealing with *28 him. But the maxim has no application to the duty of an agent, of whom ordinary skill only is required. Reasonable skill and knowledge only is demanded in every other branch of science; why should absolute knowledge and consummate skill be required in a department, where it is often impossible to know the law in its application to a particular state of facts, until it has been authoritatively declared ? Take for instance, on this very point, as to the legal mode of demanding payment of a bill of exchange, the case of Rowe v. Young, 2 Brod. & Bing. 165, and 2 Bligh, 391, decided in the House of Lords, in 1820. It was the case of a bill of exchange, payable at a day certain, drawn generally on A. B., and by him accepted, payable at the house of a banker, specially designated by the acceptance. The question was, whether it was necessary to aver and prove, in order to maintain an action against the acceptor, that payment had been demanded at the banker’s at the maturity of the acceptance. The court of king’s bench had decided the question one way, and the court of common pleas the other, and in the House of Lords, on reference to the twelve judges, there was great diversity of opinion, and most of the judges stated the grounds of their respective opinions, at great length. It was ultimately held, that it must be averred and proved, that it was demanded at the house of the banker designated in the acceptance. Now suppose, before that decision, a banker in London had received from his correspondent in the country such an acceptance, and, following a series of decisions in the court of king’s bench, had presented it, at maturity, not at the house of the banker, but to the acceptor personally, at another place; but that, before any recovery had on the bill, this decision of the House of Lords had occurred : Would it be reasonable to hold such an agent personally responsible for the knowledge of so doubtful a point of law ? If it would, it would be holding him for a degree of skill greatly beyond that required by the rule. But after such a decision, a decision of so much importance that it would be likely to be soon known to men conversant with that branch of business, it would not be unreasonable to hold, soon after it was generally promulgated, that not to be *29 acquainted with it, and act conformably to it, would be negligence or ignorance, rendering such an agent liable.
And we think this rule is not unsupported by authority, especially in its application to attorneys, whose business it is to know the law, and act upon it, for the benefit of their employ ers. In Pitt v. Yalden, 4 Bur. 2061, which was a case against an attorney, for negligence, or mistake of the law, in not charging a defendant seasonably in execution, Lord Mansfield said, “ not only counsel but judges may differ, or doubt, or take time to consider. Therefore an attorney ought not to be liable, in cases of reasonable doubt.” But where an attorney is employed to investigate a title to an estate, and, in taking the opinion of counsel, fails to lay before him deeds necessary to the understanding of the title, this is negligence, for which he is liable. Ireson v. Pearman, 3 Barn. & Cres. 799.
The case of Baikie v. Chandless, 3 Campb. 17, was an action against an attorney for negligence in preparing the assignments of an annuity, in not complying with some rule of law to render it valid. The annuity was regularly paid for 14 years. A case was then decided, upon a construction of the statute, turn ing upon a very doubtful question of law, by which it would appear that the assignment was void. Lord Ellenborough said it was impossible to impute that to the defendant as negligence for not discovering a defect in the memorial of an annuity, which was subsequently held to be a defect upon a very doubtful construction of the statute. An opinion of Mr. Justice Le Blanc to the same effect was cited with approbation, in the same case.
In Park v. Hammond, 6 Taunt. 495, and 2 Marsh. 189, which was a case against an insurance broker for negligence and noncompliance with his orders in effecting insurance for the plaintiff, by means of which he lost the benefit of his policy ; Copley, Serjt. moved to set aside the verdict for the plaintiff, on the ground that certain decisions on the point, on which the plaintiff failed of recovering on his policy, had been published so recently before the time of effecting the insurance, that the defendant was not responsible for not being acquainted with them. The case was decided upon other grounds ; but Mr *30 Justice Park, in his opinion, said that, the point having been settled ever since a case in 4 East, and down to a late case in 2 M. & S., no person undertaking to insure for others could be ignorant of it. This clearly implies, that if the judicial decision upon the point had not been known, and, a fortiori, if it had not been made before the insurance was effected, the broker would not have been responsible for his ignorance of the law, in not being acquainted with it.
Supposing these principles to be correct, and to be the true principles, on which the case is to be decided, we are then called upon to apply them to the circumstances of the present case; the facts upon the evidence, as well as the law, being left to the court. One question is, whether the usages and practices of other bankers, brokers, and bill holders, is competent evidence. If the question turned solely on the point, whether in law the note was due and payable on the 12 th or on the 15th of July, it would present a very different matter. But the real issue is, whether the defendants used due care, skill and diligence in their employment, as collectors of bills ; and on that point, the usage and practice of others, reputed to be skilful and diligent in the same employment, is of great importance, and bears directly on the question. In this respect the case is very much like that of Chapman v. Walton, 10 Bing. 57. In general, where a banker follows the usual course of dealing, though his employer sustain loss by it, he is not liable for negligence. Russell v. Hankey, 6 T. R. 12.
It appears by the evidence to have been the uniform course, for the holders of post notes to present them on the day of maturity without grace, and for the banks to pay them on such day, until they became insolvent, and declined paying at all. Now, so long as this practice continued, whether the banks paid under a mistaken belief that they were bound so to do, or because it was more for their interest to do so than to claim the days of grace, it might well be considered to be the duty of an agent to present the note on such day, although, for greater precaution, it might also have been presented on the last day of grace. And if, in the present case, the Franklin Bank had *31 generally redeemed their bills, up to the 13th or 14th of July, and if the defendants had forborne to present the note of the plaintiffs till the 15th, though since ascertained to be the true day on which payment by law was to be demanded, the plaintiffs would at least have had cause to complain that the defendants had not followed the usual course, by which their note would probably have been paid ; though it would by no means follow, that if the plaintiffs had made a presentment and de mand, according to law, they would have been liable to an action. The object of the plaintiffs, in employing the defendants to collect their note, was twofold; first, to obtain payment of the promisors, but failing in that, to charge the indorsers. Had the bank remained solvent, the presentment at maturity, without grace, would have been more likely to accomplish the former purpose; and to compass the other, as it now appears, a presentment on the latter would be necessary. Those who were extremely cautious, as appears by the evidence, to make all sure, did both.
In considering how far following the usage could operate to excuse, we must take the usage as it prevailed before the failure of the banks, and before a controversy on the subject arose. No question appears to have arisen until the 7th of July, when the action was brought by Perkins v. Franklin Bank, but under great doubts, on the part of the attorney who commenced it, whether it would lie ; but because, if he waited till the 10th, (the last day of grace,) it would be unavailing. Such a suit, proceeding on the ground that the note was due without grace, if it were known, would be likely to confirm the confidence of persons unskilled in the law, that the note was then due. On the 11th July, Staples’s action was brought, on a demand made on the last day of grace. Staples v. Franklin Bank, 1 Met. 43. It was not, therefore, until the day before the plaintiff’s note fell due, that an action was commenced, which would test the question whether the note was due without grace, or with grace. After that controversy had thus arisen, it is natural to presume that different holders would adopt different courses, as they might be advised, and that there would be no uniform *32 practice on the subject; and such seems to have been the result.
The plaintiffs attempted to show, that the practice was not uniform, and to prove by Mr. Bradford, that he demanded two several notes, at the request of the Merchants Bank, on the fast day of grace. But these were so protested August 24th and September 9th, respectively, after the abovenamed suits had been commenced. Mr. Dexter testified, that he protested a number of post notes after the 5th or 7th of July, but does not say on what day particularly he first protested any one on the last day of grace. Unless it was previously to the 12th of July, we think it not material.
Mr. Stevenson presented and protested a number of these post notes on the last day of grace, but one only before 12th July, and that was on the 10th, for the Suffolk Bank. This might not be known, and, if known, it would only raise a doubt, whether the previously prevailing practice was a correct one.
On this evidence, the court are of opinion, that the defendants were not chargeable with culpable ignorance of the law, or want of due care and skill in not knowing when this note became due, and that by law it was not due till the 15th, inasmuch as that depended upon a doubtful question of law, not then settled; that in following the practice which had generally prevailed, up to that time, they were excusable; and therefore that this action cannot be maintained.

Plaintiffs nonsuit.